UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MICHAEL AMBRON,

        Plaintiff,

                                      Case No.  1:14-CV-402

v.

                                      HON. ROBERT HOLMES BELL

PNC BANK, a corporation, and
BLYTHE COLWELL, an individual,

        Defendants.

_____/

## O P I N I O N

This action alleging gender and marital status discrimination and retaliation and denial of severance benefits is before the Court on a motion for summary judgment filed by Defendants. (ECF No. 22.)  For the reasons that follow, the motion will be granted in part and denied in part.

## I.

Plaintiff worked for Defendant PNC Bank[1] and its predecessor, National City Bank, in Kalamazoo County from December 2005 until his termination on March 15, 2012. Plaintiff started as a collector in the collection department in Oshtemo, Michigan.  In 2007, Plaintiff became a fraud analyst in the debit card fraud department.  From 2007 to 2011,

---

[1]The complaint names PNC Bank, a corporation.  According to Defendants, the actual name of the corporation is PNC Bank, National Association.

Plaintiff reported to Jennifer Broadworth, who in turn reported to Defendant Blythe Colwell. (Ambron Dep. 11-12, 77.)  For a short period of time in 2011, Plaintiff reported to Danni Van Order.  (*Id*. at 12, 105, Ex. 16.)  For six weeks, from early February 2012 until his termination on March 15, 2012, Plaintiff reported directly to Colwell.  (*Id.* at 13.)

Plaintiff's wife, Alicia Ambron, also worked at PNC.  She worked in the credit card fraud department which was adjacent to the debit card fraud department.  (*Id.* at 206-07.)  In September 2011, Ambron and Alicia advised their co-workers that they were filing for a divorce.  (*Id.* at 198-99.)

Plaintiff's work hours were 8:30 a.m. to 5:00 p.m.  (Colwell Dep. Ex. 9.)  Fraud analysts were entitled to fifty minutes for combined lunch and breaks per eight hour shift. Fraud analysts were expected to be logged onto their phone at the start of their shift and upon their return from lunch and breaks.  (Ambron Dep. 85-86.)   Employees received phone warnings for not being logged on at the start of their shift and not adhering to break and lunch times.  (*Id.* at 186.)  Ambron acknowledges that phone warnings were automatically generated under a non-biased system.  (*Id.* at 123-24.)

The PNC work rules provide generally for progressive corrective action (verbal warning, written warning, probation, final written warning, and termination).  However, the Corrective Action policy also lists several examples of situations that might result in immediate termination, including "insubordination or refusing to perform assigned duties or responsibilities."  (Harrison Decl. ¶ 5, & Ex. 1.)

In the three years prior to his termination Plaintiff acknowledges that he had discussions with each of his three supervisors about returning late from breaks. (Ambron Dep. 32.) He received a verbal warning on November 22, 2010, from Broadworth for poor judgment on cases, for failure to produce the same volume as his peers, for his high error rate, and for spending too much time on the telephone. (*Id*. at Ex. 13.) He received a written warning from Broadworth on April 28, 2011, for including an inappropriate comment on a case file. (*Id*. at Ex. 14.) He received a written warning from Broadworth on September 1, 2011, for failing to meet his goals for reducing his error rate and his telephone use. (*Id.* at Ex. 15.) Van Order noted on Plaintiff's January 20, 2012, performance review that Plaintiff had improved his production and had met his production goal, but that he had not met his error rate goal, his phone warning goal, or his loss goal, and that he was exceeding his break and lunch times. (*Id.* at Ex. 16, p. 5.) Van Order gave him an overall rating of "Does Not Meet Expectations." (*Id.* at p. 6.) Plaintiff received a written warning from Colwell on February 8, 2012, for creating a $2,934.95 bank loss as a result of his untimely work on cases assigned to him, for providing management with incorrect information regarding his work, for excessive phone times, and for excessive errors. (*Id*. at Ex. 17.) On March 14, 2012, Colwell requested assistance from Karen Harrison in the Personnel Department in placing Plaintiff on probation. Colwell's reasons for this request were additional instances since the written warning of delayed returns from lunch or break, unworked cases, and false statements. (Colwell Dep. 147 & Ex. 8.)

Between January 3, 2012, and March 15, 2012, Plaintiff received far more phone warnings than any of the eight other representatives in the debit fraud department. (Ambron Dep. Ex. 19.) Plaintiff does not dispute the accuracy of the phone warning log, but testified that it did not necessarily mean that he was late, because he often forgot to log in after he returned to his desk. (*Id.* at 123-24.) On March 9, 2012, Colwell sought guidance from PNC's Employee Relations Department about placing Plaintiff on probation, the next step in the disciplinary process, for his continued performance issues. (Harrison Decl. ¶ 7.) Karen Harrison, who was assigned to work with Colwell on this issue, requested Colwell to supply updated information on the dates Plaintiff had been late since his written warning on February 1, 2012. (*Id.* at Ex. 3.) Colwell provided the information on March 14, 2012. (Colwell Dep. Ex. 8.)

On March 15, 2012, Plaintiff came to work early and printed off a picture of Will Smith for a collage his son was preparing for a school project. (Ambron Dep. 142, 145.) Colwell was not at work that day, so Christine Russon was his acting supervisor. That morning, Russon walked by Plaintiff's desk, noticed a non-work related poster on his desk, and asked him what he was working on. (Russon Dep. 22-23.) When she learned that it was not work-related, she told him he needed to put it away because it was distracting and he needed to go back to work. (*Id.* at 23.)

At some point in time prior to 9:40 a.m., Melita Terrentine, Plaintiff's co-worker in the debit card fraud section, walked by Plaintiff's desk and asked what he was doing. He

handed her a sheet of paper describing his son's assignment, and said it was a report on Will Smith. (Terrentine Dep. 49.)  Plaintiff said they had just found the assignment in his son's backpack the night before and it was due at noon, so he was doing it for his son and was going to drop it off at his school before noon.  (*Id.* at 49-50.)  Terrentine noticed a Word document on Plaintiff's computer with the name Will Smith on it.  (*Id.* at 51.)

Terrentine was angry because they were busy and she was waiting on work from Plaintiff.  Terrentine had frequently expressed her frustrations with Plaintiff's work and lack of work to Van Order when she was the supervisor of the debit card fraud section.  (*Id.* at 56.)  Accordingly, when Terrentine got back to her desk, she posted a "same time" message to Van Order, telling her about Plaintiff's work on his son's homework.  (*Id.* at 54.)

| | |
|---|---|
| 9:39:53 a.m.  Terrentine | so......The Usual Suspect is actually working on a school report for his son on work time. Showed it to me. WTH am I supposed to do with that information?!?!?!  I think he enjoys telling me how he's goofing off at work because he knows I cant actually do a damn thing about it unless I rat him out. |
| 9:40:41 a.m.  VanOrder | OMG!! why does he not know how to work at work???? |
| 9:41:42 a.m.  Terrentine | the report is due today and so he's DOING IT FOR cam ON WORK TIME instead of making him do it himself or take his lumps for not having it done. |

(Defs. Ex. F, Russon Decl. ¶ 4, Ex. 1; Terrentine Dep. at 55-56.)  Van Order forwarded her same time communications with Terrentine to Russon.  (Russon Dep. 27, 49.)

When Terrentine walked by Plaintiff's desk a second time, she saw Plaintiff typing the same Word document he had been typing in when they discussed the project earlier that morning.  (*Id.* at 64.)

Van Order advised Russon that Terrentine had reported that Plaintiff was working on the project, and was upset because they were busy and had a lot of work to do.  (*Id.* at 27.) Russon went over to Plaintiff's desk and observed that he was working on the project again. He had the collage out and was touching it.  (*Id.* at 28.)  Russon called Plaintiff into the office and told him that it was not acceptable for him to be doing non-work on work time. Plaintiff's response was that it was his son's project, that he needed to get it done for his son to get it turned in that day, and he was worried that if it was not turned in, it would have repercussions on his divorce and custody.  (*Id.* at 30-31.)

Plaintiff testified that he only worked on his son's homework before his work day began.  (Ambron Dep. 142.)  He testified that he spoke to Melita Terrentine about the project before 8:30.  (*Id.*  at 143.)  He testified that before 8:30, when Russon asked him to remove the project from his desk, he did as she asked and placed it in the top drawer of his desk.  (*Id.* at 142-43, 169.)  According to Plaintiff, there was no Word document associated with his son's homework; he was only working on a collage.  (*Id*. at 145-46.)

Russon contacted Colwell and told her that Plaintiff had continued to work on personal work after she told him to put it away.  (Russon Dep. 33-34.)  During a conference call, Karen Harrison of Human Resources gave Colwell the go ahead to terminate Plaintiff.

(Colwell Dep. 63.)  On the afternoon of March 15, 2012, Colwell came into the office and discharged Plaintiff for insubordination.  (Ambron Dep. 187.)

At the time of Plaintiff's termination, there were nine fraud analysts.  Other than Plaintiff, they were all women.

Plaintiff filed this action alleging discrimination on the basis of his gender (male) and marital status (his pending divorce), retaliation in violation of the Michigan Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2101-2804, and denial of severance benefits in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, in the Circuit Court for the County of Kalamazoo.  Defendant PNC Bank and Colwell removed the action to federal court on the basis of both diversity and federal question jurisdiction.  (ECF No. 1.)

## II.

Defendants move to dismiss Plaintiff's claims in their entirety under the doctrine of judicial estoppel based on Plaintiff's failure to disclose his interest in these claims as a potential asset in his Chapter 7 bankruptcy proceeding.

The doctrine of judicial estoppel prevents a party from asserting a position contrary to one that the party asserted under oath in a prior judicial proceeding if the prior court adopted the contrary position in a preliminary or final disposition.  *Browning v. Levy*, 283 F.3d 761, 775 (6th Cir. 2002).  The purpose of the doctrine is to protect the integrity of the judicial process by preventing parties from abusing the process through gamesmanship. *Id*.

7

at 776.  The doctrine is not applicable where the prior inconsistent position amounted to no more than mistake or inadvertence.  *Id.*

Before finding that a party is judicially estopped on the basis of a previous bankruptcy proceeding, the court must find that

> (1) [the plaintiff-debtor] assumed a position that was contrary to the one that [he] asserted under oath in the bankruptcy proceedings; (2) the bankruptcy court adopted the contrary position either as a preliminary matter or as part of a final disposition; and (3) [the] omission did not result from mistake or inadvertence.

*White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 478 (6th Cir. 2010).  "Applying judicial estoppel under these circumstances recognizes the importance of the bankruptcy debtor's affirmative and ongoing duty to disclose assets, including unliquidated litigation interests."  *Kimberlin v. Dollar Gen. Corp.*, 520 F. App'x 312, 314 (6th Cir. 2013).

Defendants contend that it is undisputed that Plaintiff did not amend his bankruptcy filings to include any mention of his claims against Defendants, and that this omission was equivalent to a statement that there were no such claims and was therefore inconsistent with his pursuit of the instant action.  *See Stephenson v. Malloy*, 700 F.3d 265, 274 (6th Cir. 2012).  According to Defendants, the only issue for this Court's consideration is whether Plaintiff's conduct resulted from mistake or inadvertence.  In making this determination, the court considers "whether: (1) [he] lacked knowledge of the factual basis of the undisclosed claims; (2) [he] had a motive for concealment; and (3) the evidence indicates an absence of bad faith."  *White*, 617 F.3d at 478.  The Court looks in particular at Plaintiff's attempts to

8

advise the bankruptcy court of his omitted claim.  *Id.*

In November 2011, Plaintiff filed a Chapter 7 petition for bankruptcy.  On March 15, 2012, Plaintiff was terminated from PNC.  On April 13, 2012, Plaintiff was discharged from bankruptcy.  (Richardson Aff., ECF No. 25-4.)  On April 24, 2012, Plaintiff consulted an attorney about his termination.  His attorney advised him to contact the bankruptcy trustee about his termination, and to ask if he needed to reopen the case.  (Piper letter, ECF No. 25-6.)  The bankruptcy trustee advised Plaintiff that because his employment was terminated after he filed his bankruptcy petition, and because it is not among the limited items listed in 11 U.S.C. § 541(a)(5) which become part of the bankruptcy estate if they come into being within 180 days after the bankruptcy filing, his cause of action for wrongful termination would not be an asset of the bankruptcy estate since it did not exist on the petition date.  (Richardson Aff.)  Plaintiff did not amend his bankruptcy petition to include his potential termination claim against PNC.

Defendants assert that the bankruptcy trustee's conclusion that Plaintiff had no duty to report his termination claim to the bankruptcy court is "unsupported by the bankruptcy code" and that the trustee's "misinformation" does not absolve Plaintiff of his duty to notify the bankruptcy court of his potential asset.  (Defs.' Reply Br. at 2 n.2, 3.)   Contrary to Defendants' assertions, the trustee's information was correct.  The bankruptcy code defines "property of the estate" to include "all legal and equitable interests of the **debtor** in property **as of the commencement** of the case,"  and "[a]ny interest in property that the **estate**

9

acquires **after the commencement** of the case."   11 U.S.C. § 541(a)(1) & (7) (emphasis added).   Property acquired post-petition by a debtor in a Chapter 7 bankruptcy proceeding generally does not become property of the estate.   *In re de Hertogh*, 412 B.R. 24, 31 (Bankr. D. Conn. 2009).   There are limited exceptions to this rule in § 541(a)(5) for inheritances, divorce decrees, and life insurance,  but they are not applicable here.   "[A] cause of action qualifies as bankruptcy estate property only if the claimant suffered a pre-petition injury." *In re Underhill*, 579 F. App'x 480, 482 (6th Cir. 2014).

Plaintiff was not terminated from his employment until after he filed his Chapter 7 bankruptcy.   Accordingly, he did not have a termination claim as of the commencement of the bankruptcy case.   Moreover, because it was Plaintiff, not the estate, who sustained the post-petition harm that gave rise to the cause of action for wrongful termination, the cause of action was not property of the estate.   *See In re de Hertogh*, 412 B.R. at 31; *see also Harris v. Viegelahn*, No. 14-400, — U.S. —, 2015 WL 2340847, *3 (U.S. May 18, 2015) ("Crucially, however, a Chapter 7 estate does not include the wages a debtor earns or the assets he acquires after the bankruptcy filing. §541(a)(1).").

The cases that Defendants have cited in support of their contention that Plaintiff had a duty to disclose his termination claim pursuant to 11 U.S.C. § 541(7) are inapposite.   In each of the cases Defendants have cited, the claim arose before the bankruptcy was filed or the case arose under a different chapter of the bankruptcy code which defines property of the estate differently.   *See*, *e.g.*, *Kimberlin*, 520 F. App'x at 315 (debtor filed under Chapter 13

10

which defines property of the estate to include property acquired after the commencement of the case but before the case is closed, 11 U.S.C. § 1306(a)); *Auday v. Wet-Seal Retail, Inc.*, 698 F.3d 902, 904 (6th Cir. 2012) (discrimination claim accrued when plaintiff was terminated and became property of her estate when she filed for bankruptcy four days later); *Lewis*, 141 F. App'x at 423 (debtor filed Chapter 13 bankruptcy petition two months after termination that was the basis of her termination claim); *Kemp v. Thi of Mich. at Detroit LLC*, No. 2:13-CV-11334, 2014 WL 793651, at *2 (E.D. Mich. Feb. 27, 2014) (debtor was terminated from her employment before she filed her Chapter 7 bankruptcy petition).

Plaintiff was not required to disclose his interest in his wrongful termination claims in his bankruptcy proceeding. Moreover, the Court is satisfied that Plaintiff's failure to disclose his claim was not made in bad faith because it was based on representations of the bankruptcy Trustee. Accordingly, Defendants' motion to dismiss Plaintiffs claims under the doctrine of judicial estoppel will be denied.

## III.

Defendants move for summary judgment on Plaintiffs' discrimination, retaliation, and ERISA claims.

The Federal Rules of Civil Procedure require the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to

determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If Defendants carry their burden of showing there is an absence of evidence to support a claim, Plaintiff must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).

In reviewing a motion for summary judgment this Court cannot weigh the evidence, make credibility determinations, or resolve material factual disputes. *Alman v. Reed*, 703 F.3d 887, 895 (6th Cir. 2013); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986) (stating that on a motion for summary judgment "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge"). "Instead, the evidence must be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party." *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 569-70 (6th Cir. 2012) (citing *Matsushita*, 475 U.S. at 587; *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009)). Nevertheless, the mere existence of a scintilla of evidence in support of Plaintiff's position is not sufficient to create a genuine issue of material fact. *Liberty Lobby*, 477 U.S. at 252. The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for Plaintiff. *Id.*; *see generally Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

## A.  DISCRIMINATION CLAIMS

Defendants contend that they are entitled to judgment on Plaintiff's discrimination

claims because Plaintiff cannot establish a prima facie case, and because he cannot demonstrate that Defendants' legitimate reason for his termination (insubordination for continuing to do his son's homework on work time after he was told by a supervisor to stop) is pretext.

Plaintiff has not presented direct evidence of discrimination or retaliation based on gender or marital status. Accordingly, his discrimination claims are analyzed under the three-step burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[2]

The first step under *McDonnell Douglas* requires Plaintiff first to establish a prima facie case. In order to make out a prima facie case of gender or marital status discrimination, Plaintiff is required to present evidence from which a jury could find that (1) Plaintiff is a member of a protected class; (2) Plaintiff was qualified for the job; (3) Plaintiff suffered an adverse employment decision; and (4) the circumstances indicate that his protected status played a role in the adverse employment action, for example, if he was replaced by a person outside the protected class, or treated differently than similarly situated non-protected employees. *Martinez v. Cracker Barrel Old Country Store, Inc*., 703 F.3d 911, 915 (6th Cir. 2013); *Serrano v. Cintas Corp.*, 699 F.3d 884, 892-93 (6th Cir. 2012) (citing *White v. Baxter*

---

[2]Although Plaintiff's discrimination and retaliation claims allege violations of the Michigan ELCRA, ECLRA claims are analyzed under the same evidentiary framework as claims under Title VII of the Civil Rights Act of 1964, § 701 et seq., 42 U.S.C. § 2000e *et seq*. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 673 (6th Cir. 2013).

*Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008)).

For purposes of this motion, Defendants do not deny that Plaintiff has presented sufficient evidence to make out the first three prongs of his prima facie case. The dispute in this case concerns the fourth prong. Plaintiff does not contend that he was replaced by a woman, or a person who was not getting divorced. Instead, he contends that Defendants treated him differently than others outside his protected class. Defendants contend that Plaintiff has failed to produce evidence that he was treated differently than any similarly situated non-protected employees.

To meet his burden of showing that he was treated differently than similarly situated non-protected employees, Plaintiff is not required to demonstrate an exact correlation between himself and others similarly situated, but he must show "that he and his proposed comparators were similar in all relevant respects, and that he and his proposed comparators engaged in acts of comparable seriousness." *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012) (citations omitted).

> [O]ne way that the plaintiff could establish a prima facie case would be to show that the employees with whom the plaintiff seeks to compare himself or herself reported to the same supervisor, were subject to the same standards, and "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."

*Jones v. City of Franklin*, 468 F. App'x 557, 562 (6th Cir. 2012) (quoting *Jackson v. FedEx Corporate Servs., Inc.*, 518 F.3d 388, 393 (6th Cir. 2008)).

With respect to his gender discrimination claim, Plaintiff has presented evidence that

14

one female employee spent hours working on her husband's new business. After Plaintiff reported her to Colwell, Colwell came over and spoke to her. (Ambron Dep. 170.)  Ten minutes later, when  Colwell walked by, the employee was obviously still doing personal business on her computer but Colwell did not say anything to her.  (*Id.* at 170-73.)  Plaintiff does not know if the employee was insubordinate because he does not know what Colwell said to her, and he does not know whether Colwell saw that she was still doing personal business ten minutes later.  (*Id.* at 173-74.)  Plaintiff also does not know if she was reprimanded.  (*Id.* at 174.)

Plaintiff identified a second female employee who spent so much time on her computer looking for a place to live and taking care of her bills that Plaintiff was required to pick up some of her cases.  (*Id.* at 175.)  Colwell knew about the situation, but Plaintiff does not know whether the employee was reprimanded or whether she was insubordinate. (*Id.* at 175-177.)  Plaintiff also gave an example of a third female employee who constantly looked at purses and boots on line.  Plaintiff testified that on one occasion Colwell came by and looked at them with her.  (*Id.* at 176.)

Plaintiff's evidence that other individuals did personal work on their computers without any repercussions does not satisfy the fourth prong of his prima facie case.  Using computers for personal work was not prohibited by company policy.  (*Id.* at Ex. 20.) Moreover, Ambron was not terminated because he used the computer for his personal business, but because he continued to conduct personal business on work time after he was

instructed to put his personal work away. Plaintiff has not identified a single instance where Defendants declined to discharge a female employee who was insubordinate to a supervisor, or who continued to conduct personal business on work time after being told to stop. (*Id.* at 169-70, 176-77.) Neither has he identified any female employee who conducted personal business on work time at a time when she was already being considered for probation.

In support of his gender discrimination claim, Plaintiff has also asserted that Defendants did not adjust his metrics (error rate) even though he volunteered to work more cases than his female co-workers. (*Id.* at 189, 227-28.) Plaintiff's suspicion that he was penalized on his error rate because he worked more cases is not supported by any evidence. The evidence is unrebutted that error rates were calculated based on a percentage of the number of cases worked and the types of errors made, and that the error rate made accommodations for the number of cases Plaintiff was working. (Colwell Dep. 90-92.) More importantly, Plaintiff has no evidence that female co-workers who took on additional cases were evaluated by a different error rate than he was. (Ambron Dep. 190; Colwell Dep. 81.)

Finally, with respect to his gender discrimination claim, Plaintiff has asserted generally that Colwell was more social with and showed more concern for female co-workers. (Ambron Dep. 49, 110.) This non-specific general perception is insufficient to create a genuine issue of material fact on the disparate treatment element of his prima facie case of discrimination. *See Jones*, 468 F. App'x at 562 (holding that bare-bones allegations

16

and conclusory statements that others were treated more favorably "are a far cry from the specificity that the fourth element requires").   The Court concludes that Plaintiff has not presented evidence from which a jury could find that he was treated differently than similarly situated non-protected employees.  Accordingly, Plaintiff has failed to make out a prima facie case of gender discrimination.

With respect to his marital status claim, Plaintiff contends that in October 2011 when he announced that he and Alicia were getting a divorce, Colwell told him he was making a mistake and that he needed to really think about it before making that decision.  (Ambron Dep. 28, 110-113.)  He contends that after he announced his divorce, Colwell's criticism of his work increased.  (*Id.* at 113-15, 193-95.)  He contends that Colwell was friendly with Alicia and supportive of Alicia's side in the divorce, and that she recommended that Alicia use her divorce attorney.  (*Id.* at 193, 199.)

Although Defendant Colwell denies talking to Plaintiff's wife about the divorce or being particularly friendly with her (Colwell Dep. 93), the Court assumes for purposes of this motion that Plaintiff's allegations are true.   Nevertheless, Plaintiff's testimony is not sufficient to create an issue of fact as to marital status discrimination.  Under Michigan law, employers are prohibited from making decisions because of  an employee's marital status. *Fonseca v. Mich. State Univ.*, 542 N.W.2d 273, 275 (Mich. Ct. App. 1995).  "It is the status of being married or not which an employer must refrain from using in a way that makes a difference in the challenged decision."  *Id.*  Plaintiff does not dispute that Colwell was the

17

third of three supervisors in a row who were concerned with his work performance, he does not dispute that he had performance issues, and he does not dispute that he continued to receive phone warnings for tardiness even after receiving his written warning in February 2012. (Ambron Dep. 118-122, 203-04.) Plaintiff's wife had the same marital status (pending divorce) as Plaintiff, and Colwell herself was divorced. (Colwell Dep. 12-13.) Given these circumstances, Plaintiff's evidence that Colwell sided with Alicia and that Colwell's criticism of Plaintiff increased prior to his termination is not sufficient to create an issue of fact as to whether he was treated differently "because of" his marital status.

Plaintiff has not presented evidence that his gender or his marital status played a role in the adverse employment action. Accordingly, the Court concludes that Plaintiff has not made a prima facie showing on either his gender or his marital status discrimination claim.

Assuming that Plaintiff had made out a prima facie discrimination case, the burden would then shift to Defendants to offer evidence of a legitimate, nondiscriminatory reason for the adverse employment action. *Serrano*, 699 F.3d at 893. Defendants have presented evidence that although the PNC Corrective Action policy provides generally for progressive corrective action, it also lists examples of situations that may result in an employee's immediate termination, including "[i]nsubordination or refusing to perform assigned duties or responsibilities." (Harrison Decl. ¶ 5; Harrison Decl. Ex. 1, pp. 8-10.) Defendants have provided evidence that Plaintiff continued to work on his son's homework during work hours after his supervisor told him to stop working on his personal project and that he was

18

terminated for this insubordination.

Because Defendants have carried their burden, under the third step of the *McDonnell Douglas* framework the burden shifts back to Plaintiff to show that Defendants' proffered reason was not its true reason, but merely a pretext for what is, in essence, unlawful discrimination. *Martinez*, 703 F.3d at 915; *Serrano*, 699 F.3d at 893. This burden merges with the Plaintiff's ultimate burden of persuading the court that he has been the victim of intentional discrimination. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). To demonstrate pretext, Plaintiff must show that Defendants' stated reason either (1) has no basis in fact; (2) did not actually motivate the decision to discharge him; or (3) was insufficient to warrant his discharge. *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).

Plaintiff contends the reason given for his discharge was pretextual because had not basis in fact. Plaintiff has testified that testified that he did not work on his son's homework after his work day began, and that he put the project away, just as he had been instructed by Russon.

There is a question of fact as to whether Plaintiff worked on his son's homework after his work day began and after Russon told him to put it away. Nevertheless, for purposes of determining pretext, the issue is not whether the proffered reason for the employment action was in fact true, but whether the employer had an "honest belief" in its truth. *Murphy v. Ohio*

19

*State Univ.*, 549 F. App'x 315, 322 (6th Cir. 2006) (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998)).   "[I]n order for an employer's proffered non-discriminatory basis for its employment action to be considered honestly held, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Id.* at 807 (quoting *Smith*, 155 F.3d at 807).   "The employer's decision-making process need not be optimal, or leave no stone unturned; '[r]ather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.'" *Id.* (quoting *Smith*, 155 F.3d at 807.)

There is no evidence to suggest that Colwell, who was responsible for terminating him, did not reasonably believe that Plaintiff continued to work on his son's homework after Russon told him to put it away.  Colwell understood that both Terrentine and Russon (neither of whom Ambron claims discriminated against him) had observed Plaintiff working on his son's homework during work time, and that both had observed Plaintiff continuing to work on the homework assignment after Russon told him to put it away.  There is nothing to suggest that Colwell did not believe that Plaintiff had engaged in insubordination.  Moreover, because work rules provided that insubordination could result in termination, and because Colwell was well aware of Plaintiff's history of performance issues and had recently begun discussions about placing him on probation, there is nothing to suggest that the penalty was not reasonably warranted under the facts as they were understood by Colwell.  Plaintiff has not met his burden of showing that Defendants' stated reason for his termination was pretext.

Viewing the evidence in the light most favorable to Plaintiff, the Court concludes that Plaintiff has not met his ultimate burden of demonstrating that his gender or his marital status was the but for cause of his termination. *See Provenzano v. LCI Holdings, Inc*., 663 F.3d 806, 812 (6th Cir. 2011). Accordingly, Defendants' motion for summary judgment on Plaintiff's discrimination claims will be granted.

## B. RETALIATION CLAIMS

Michigan's ELCRA provides that "a person shall not . . . [r]etaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceedings, or hearing under this act." Mich. Comp. Laws § 37.2701(a).

In order to establish a prima facie case of retaliation under the ELCRA, a plaintiff must show that: (1) he engaged in protected activity (2) that was known by the defendant, and (3) the defendant took an adverse employment action against him, and (4) his protected activity was a "significant factor" for the employer's adverse action. *MacDonald v. United Parcel Serv*., 430 F. App'x 453, 463 (6th Cir. 2011) (quoting *Aho v. Dep't of Corr*., 688 N.W.2d 104, 108 (Mich. Ct. App. 2004)).

Defendants contend that it is entitled to summary judgment on Plaintiff's retaliation claims because Plaintiff cannot demonstrate that he engaged in protected activity under the ELCRA, and he cannot prove causation or pretext.

Protected activity includes charging a violation of the act. The employee need not

21

specifically cite the ELCRA. "However, the employee must do more than generally assert unfair treatment." *Barrett v. Kirtland Cmty. Coll.*, 628 N.W.2d 63, 72 (Mich. Ct. App. 2001). To qualify as protected activity, the charge "must clearly convey to an objective employer that the employee is raising the specter of a claim of unlawful discrimination under the ELCRA." *Id.*

Plaintiff has not directly responded to Defendants' assertion that he has failed to demonstrate that he engaged in protected activity under the ELCRA. Plaintiff merely asserts that his prima facie case of retaliation is based on his complaint to the human resources department that Colwell discussed Plaintiff's confidential communications with Alicia. (Pl. Br. 14.) Specifically, Plaintiff contends that on one occasion Colwell told Alicia that Plaintiff was late returning from his divorce attorney's office, and Plaintiff suspects that Colwell told Alicia that Plaintiff's girlfriend was pregnant. (Ambron Dep. 115-17, 129-30, 201-2-3; Alicia Ambron Aff., ECF No. 25-1.)

The evidence reflects that in October 2011, Plaintiff sent an email to the Employee Relations Information Center ("ERIC"), saying he wanted to talk to someone about issues he was having with his current supervisor, Colwell. Susan Andreano, an Employee Relations Specialist, called him back. She summarized her conversation with Plaintiff follows: Plaintiff told her that he and his wife Alicia are in the process of a divorce; that she has recently moved to a new position in the credit fraud group; that she now works within 50 feet of him; and the situation has become uncomfortable for Plaintiff. (Ambron Dep. 206-07.)

22

Alicia was harassing him at work and Plaintiff did not want anyone else to be uncomfortable with the marital issues being brought into work.  (*Id.* at 207.)  Colwell told him to politely and professionally let Alicia know she was jeopardizing his job and they should handle it when he got out of work. (*Id.* at 208.)  Plaintiff thought it was good advice, and he followed it. (*Id.*)  However, after that date, Colwell became more supportive of Alicia's claims than of Plaintiff's.  (*Id.*)

Plaintiff had another conversation with Andreano in December 12, 2011, in which he mentioned that he had said some things to Colwell in confidence that were getting back to his wife.  (*Id.* at 212.)  However, he acknowledges that the conversation was mostly about harassment from Alicia.  (*Id.* at 216.)  Plaintiff told Andreano about emails he sent to Alicia telling her to stop harassing him at work, that he had already filed a complaint with HR, and that he would be forwarding all of her emails to them.  (*Id.* at 217.)

On December 14, 2011, Plaintiff sent an email to Andreano, to which he attached an email from Alicia about visitation:

> THIS WAS RECEIVED FROM ALICIA YESTERDAY AFTERNOON.  AS I HAD ALREADY DISCUSSED WITH YOU PREVIOUSLY I HAVE ALREADY FILED A HARASSMENT REPORT WITH KALAMAZOO COUNTY POLICE REPORT #11-12041 ON 12/11/11.  SHE HAS BEEN ASKED PREVIOUSLY NOT TO HAVE CONTACT WITH ME AT WORK, THAT IS OBVIOUSLY NOT HAPPENING.  I UNDERSTAND THAT THERE HAS TO BE STEPS TAKEN AND I APPRECIATE ALL THAT YOU HAVE DONE THUS FAR, BUT THIS IS BECOMING VERY STRESSFUL. I AM ALREADY BEHIND BECAUSE OF MISSING TIME FOR COURT, AND THIS MAKES IT VERY HARD TO FOCUS AND GET CAUGHT-UP.

23

(*Id.* at Ex. 30.)

Plaintiff's request that his employer do more to help him avoid harassment from Alicia while at work is not a protected claim of discrimination under the ELCRA. Even if Plaintiff's communications with ERIC and Andreano included a complaint that Colwell had disclosed to Alicia confidential information about Plaintiff's failure to return from a meeting with his divorce attorney, Plaintiff's conversations with and emails to Andreano do not clearly convey that he was raising the specter of a claim of unlawful discrimination under the ELCRA. Plaintiff has not met his burden of demonstrating that he engaged in protected activity. Accordingly, Defendants are entitled to summary judgment on Plaintiff's ELCRA retaliation claims.

## C. ERISA CLAIM

Defendant PNC contends that it is entitled to summary judgment on Plaintiff's ERISA claim because he was not eligible for benefits under the plan, he did not file a claim for benefits under the plan, he has no evidence to establish an interference claim under ERISA § 510, and he cannot assert and ERISA claim against PNC.

Plaintiff has advised that he will not pursue his claim under ERISA. (Pl. Br. 1, ECF No. 25.) Accordingly, summary judgment will be entered in Defendants' favor on Plaintiff's ERISA claim.

## IV.

For the reasons stated herein, Defendants' motion for summary judgment will be

granted in part and denied in part.  To the extent Defendants request dismissal of the entire case on the grounds of judicial estoppel, the motion will be denied.  To the extent Defendants request summary judgment on each of Plaintiff's claims, the motion will be granted.

An order and judgment consistent with this opinion will be entered.


Dated: <u>May 27, 2015</u>                          <u>/s/ Robert Holmes Bell                    </u>
                                            ROBERT HOLMES BELL
                                            UNITED STATES DISTRICT JUDGE

25